1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8    EVELYN PUTZ, et al.,                    No. 10-00344 CW

9            Plaintiffs,                      ORDER DENYING
                                             PLAINTIFFS'
10       v.                                   MOTION FOR A
                                             PRELIMINARY
11   ARNOLD SCHWARZENEGGER, et al.,           INJUNCTION AND
                                             GRANTING IN PART
12           Defendants.                      DEFENDANTS'
     _____/      MOTION TO DISMISS
13

14

15        Plaintiffs, In-Home Supportive Services (IHSS) consumers and

16   two associations, the California Association of Public Authorities

17   and the In-Home Supportive Services Consumer Alliance, filed suit

18   against various state officials seeking to enjoin reductions in the

19   funding of public authorities.  A public authority is a "corporate

20   governing body" that has "all powers necessary or convenient to

21   carry out the delivery of in-home supportive services."  Cal. Welf.

22   & Inst. Code § 12301.6(b)(2)(B).  Plaintiffs have filed a motion

23   for a preliminary injunction.  Defendants oppose the motion and

24   have filed a motion to dismiss some of the causes of action

25   asserted in Plaintiffs' complaint.  The matter was heard on April

26   15, 2010.  Having heard oral argument and considered all of the

27   papers filed by the parties, the Court DENIES Plaintiffs' motion

28   for a preliminary injunction and GRANTS IN PART Defendants' motion

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

to dismiss.

BACKGROUND[1]

Under the 1965 federal Medicaid Act, the federal government financially assists participating states that provide medical services to eligible beneficiaries.  California participates in Medicaid through the Medi-Cal Program.  In 1973, California established the IHSS program to provide assistance with the tasks of daily living to low-income elderly and disabled persons.  IHSS is funded with a combination of state, county and federal Medicaid monies.  Cal. Welf. & Inst. Code § 12306.  IHSS providers give services such as assistance with bathing, dressing, cooking, feeding, bowel and bladder care, self-administration of medication and cleaning.  Id. § 12300(b), (c).  Over 360,000 IHSS providers serve over 440,000 individuals in California.  Over sixty-two percent of IHSS recipients are served by a relative.

To qualify for federal matching funds for care and services, a state must establish and administer its Medicaid program through a state plan approved by the federal Secretary of Health and Human Services. 42 U.S.C. § 1369b(a)(7).  The California Department of Health Care Services (DHCS) is the single state agency designated to administer California's state plan under Medi-Cal.  The Department of Health Care Services has delegated authority to the California Department of Social Services (CDSS) to implement the IHSS program.

IHSS is administered by the state's counties.  To provide for

---

[1]The Court takes judicial notice of the state and county records submitted by both Plaintiffs and Defendants.

2

United States District Court
For the Northern District of California

the delivery of in-home supportive services, counties have the option of administering the IHSS program themselves, contracting with a non-profit consortium or establishing, by ordinance, a public authority for the delivery of in-home supportive services. Cal. Welf. & Inst Code § 12301.6(a), (b). This case concerns the funding of public authorities.

If a county chooses to administer IHSS through a public authority, the public authority must carry out the following specific "functions": (1) help recipients find IHSS providers by maintaining a provider registry, (2) conduct background checks on potential providers, (3) establish a provider referral system and (4) provide training for providers and recipients. Id. § 12306.1(e)(1)-(4). Public authorities must also perform "any other functions related to the delivery of in-home supportive services." Id. § 12306.1(e)(5). However, the work of public authorities "shall not be limited to those functions." Id. § 12306.1(e).

Public authorities are not the employers of the individual caregivers who provide IHSS to recipients. Although they are "deemed" to be the employer of individual providers for purposes of collective bargaining regarding provider wages and benefits, recipients retain full authority to hire, fire and supervise the work of their providers. Id. § 12301.6(c)(1). Also, public authorities are not the employers of IHSS providers for purposes of liability for a provider's negligent or intentional conduct. Id. § 12301.6(f)(1).

Public authorities are funded according to a public authority

3

rate.  A public authority rate is the hourly rate paid to public authorities to run a county's IHSS program.  The rate is comprised of two components: an hourly rate for administrative costs to run the public authority and an hourly rate for provider wages, benefits and taxes.  The public authority rate must be approved by the county, CDSS and DHCS before providers and public authorities will be reimbursed for their work.  Each county public authority has its own public authority rate.

For instance, on August 1, 2008, San Bernardino was approved for a public authority rate of $10.54 per hour.  This included a wage of $9.25 per hour for IHSS providers, payroll taxes of $.74 per hour, health benefits of $.38 per hour and administrative costs of $.17 per hour.  Lopez Decl., Exh. 3.

San Bernardino's administrative costs for fiscal year 2008-2009 include: salary and benefits for twenty-five employees, leases for office space and copy machines, maintenance of computers and software, postage and mailing, office supplies, telephones and cell phones, workshop and seminar registration fees, travel expenses, costs to perform background checks on IHSS providers, advertising, insurance, legal services and funds to pay for emergency back-up provider services.  Id.  The budget for San Bernardino's administrative costs for 2008-2009 was $3,238,266.  Id.  The hourly rate for administrative costs ($.17/hour) was calculated by dividing the total amount of administrative costs for 2008-2009 ($3,238,266) by the total number of projected hours to be worked by

4

**United States District Court**
For the Northern District of California

IHSS providers in 2008-2009 (20,129,420).[2]  DHCS must provide these hourly rates for administrative costs to Medicaid in order to be reimbursed.  Lopez Decl. ¶ 12.

Public authorities do not receive payments directly from the State for their operations.  Rather, the counties advance funds to public authorities and the counties are reimbursed by the State for the state and federal share of the public authorities' administrative costs.  IHSS providers are paid in a different manner.  Depending on the county, IHSS providers submit their timesheets to the county or the public authority and the information on the timesheets is entered into a state-wide payroll system called the Case Management, Information and Payrolling System.  The State Controller's Office then pays the IHSS providers directly.  The State seeks reimbursement from the counties and federal government for their respective shares of the IHSS provider wages.  Public authorities neither receive nor pass-through payments for the care and services provided by IHSS providers.

In response to California's current budget crisis, the California Legislature passed AB X4 1 on July 23, 2009.  AB X4 1 contained a variety of cost cutting measures, including reductions to various appropriations previously set forth in the Budget Act of 2009, which was signed into law on February 20, 2009.  One such

---

[2]Although San Bernardino states that its rate for administrative costs is $.17 per hour, after dividing the total administrative costs by the total number of IHSS hours, the Court calculated the rate to be $.16 per hour.  Either San Bernardino miscalculated the rate or the Court has not accounted for a rounding error not explained in San Bernardino's financial report to the state.

cost cutting measure reduced the appropriation for the IHSS program.  At issue in this case is the Legislature's $4.7 million reduction for public authorities.  Before signing AB X4 1 into law, the governor used his line item veto power to reduce public authority funding by an additional $8.6 million.  In total, these reductions resulted in a fifty-seven percent reduction in the money the State contributed to the operations and services provided by public authorities.  The new law also capped the amount of money the state general fund can contribute to the operation of public authorities at $10 million.

More than seven months after AB X4 1 became law, Plaintiffs filed this suit.  Plaintiffs challenge AB X4 1 on several grounds. Plaintiffs assert that the law is preempted by 42 U.S.C § 1396a(a)(30)(A) (hereinafter Section 30(A)) because the Legislature and Governor failed to conduct and consider a substantive analysis of the effects of AB X4 1 and because the funding reductions failed to meet the substantive requirements of Section 30(A).  Plaintiffs also argue that AB X4 1 violates the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act because it discriminates against IHSS recipients on the basis of disability and will lead to their unnecessary institutionalization.  Lastly, Plaintiffs claim that the Governor abused the line-item veto power granted under Article IV, Section 10 of the California Constitution.[3]

---

[3]Plaintiffs do not rely on their line-item veto claim as a basis for seeking a preliminary injunction.

**United States District Court**
For the Northern District of California

DISCUSSION

I.   Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., ___ U.S. ___, 129 S. Ct. 365, 374 (2008). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Id. at 376 (quoting Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 542 (1987)).

A.   Likelihood of Success on the Merits

1. State Sovereignty

Defendants first argue that Plaintiffs' claims fail because the remedy they seek impermissibly intrudes upon California's sovereign immunity. Under Ex Parte Young, 209 U.S. 123 (1908), the Eleventh Amendment does not provide immunity to state officials for claims of equitable relief that would have an ancillary effect on a state budget. See Suever v. Connell, 579 F.3d 1047, 1060 n.7 (9th Cir. 2009) ("The scope of the Ex Parte Young exception has since been limited to claims for prospective equitable relief and state funds 'ancillary' to such relief . . . ."). Defendants assert that Ex Parte Young does not extend to the type of challenge Plaintiffs make in this case.  The Court disagrees.

Courts routinely rely on the Ex Parte Young exception to the Eleventh Amendment to ensure sufficient appropriations to comply

7

United States District Court
For the Northern District of California

with the Medicaid Act.  See <u>Washington State Health Facilities Ass'n</u> <u>v. State of Washington Dep't of Social & Health Servs.</u>, 698 F.2d 964, 966 (9th Cir. 1982); <u>Dominguez v. Shwarzenegger</u>, 596 F.3d 1087 (9th Cir. 2010).  Here, Plaintiffs seek declaratory and injunctive relief to compel Defendants to comply with federal laws; Plaintiffs do not seek retrospective damages.  Plaintiffs' claim for this type of equitable relief does not violate the Eleventh Amendment. Plaintiffs seek a prospective order preventing Defendants from applying reductions to public authorities in the future.  This is similar to the injunction enjoining the State from decreasing the wage that it would reimburse IHSS providers which was recently upheld by the Ninth Circuit in <u>Dominguez</u>.  596 F.3d at 1097.

   1. Medicaid Act Claims

  Plaintiffs' first two causes of action allege that Defendants violated the substantive and procedural requirements of Section 30(A) of the Medicaid Act.  To receive federal financial participation in payment for services that states provide to low income persons who are aged, blind, disabled or members of families with dependent children, states must agree to comply with applicable federal Medicaid law.  <u>Orthopaedic Hosp. v. Belshe</u>, 103 F.3d 1491, 1493 (9th Cir. 1997).  As noted above, the Medicaid Act requires a participating state to develop a state plan which describes the policy and methods to be used to set payment rates for each type of service included in the program.  42 C.F.R. § 447.201(b).  Section 30(A) of the Medicaid Act requires, in relevant part, that a state's Medicaid plan:

   provide such methods and procedures relating to the

United States District Court
For the Northern District of California

8

United States District Court
For the Northern District of California

> utilization of, and the payment for, <u>care and services</u> available under the plan . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

(Emphasis added).  Rather than argue that they have complied with the requirements of Section 30(A), Defendants argue that these requirements do not apply to payments to public authorities because public authorities do not provide any "care and services" to IHSS recipients.

Plaintiffs disagree and point to a 1994 letter written by a Deputy Director of the Department of Health Services, John Rodriguez.  In this letter, Rodriguez noted that, irrespective of whether IHSS was administered by counties, public authorities or non-profit consortiums, rate changes are "subject to the provisions of [Section] 30(A)."  Rolfe Decl., Exh. 16.  However, Rodriguez's statement refers generally to the total public authority rate methodology, not specifically the administrative cost rate component of the total public authority rate.  Thus, his comment cannot be read to imply that the public authority's administrative costs go toward providing personal "care and services."

Plaintiffs also argue that, because the state plan "deems" an IHSS public authority to be a "Medi-Cal provider," payments to public authorities are necessarily made for care and services. This argument has no merit.  The section of the state plan to which Plaintiffs cite addresses the relationship between public authorities and individual service providers for purposes of collective bargaining.  It states, "Within the meaning of . . .

9

[the sections of] the California Government Code relating to collective bargaining by employee organizations that include employees of a public agency, any public authority created pursuant to this section is deemed to be the employer of persons referred to recipients to provide personal care services and is also deemed to be the Medi-Cal provider of record." Gomez Decl., Exh. 3.  By deeming public authorities the employers of the IHSS providers for collective bargaining purposes, this provision placed the public authorities on the opposite site of the bargaining table from the IHSS providers for purposes of negotiating wages and benefits. Thus, this section of the state plan cannot fairly be read to imply that public authorities provide care and services to IHSS recipients.  Moreover, Plaintiffs' argument carries even less weight now that the current version of the state plan contains no reference to public authorities being "deemed" to be Medi-Cal providers of record.  Gomez Decl., Exh. 4.

Plaintiffs also emphasize that the state plan discusses public authority rates in the section entitled, "Payment for Services," not the section entitled "Administration."  However, this is not surprising considering that the total public authority rate consists primarily of the wages and benefits paid to IHSS providers.  The fact that the total public authority rate also contains a small portion of administrative costs associated with providing those services is not inconsistent with placing the description of the entire public authority rate in the "Payment for Services" section of the state plan.

Plaintiffs lastly rely on the manner in which California has

10

United States District Court
For the Northern District of California

sought reimbursement for IHSS costs from the federal government under the Medicaid Act.  Under the Act, state expenditures for "care and services" are subject to a different level of federal funding than administrative costs.  Specifically, expenditures for "care and services" may receive federal funding at a state's Federal Medical Assistance Percentage (FMAP).  See 42 U.S.C. § 1396b(a)(1); 42 C.F.R. § 433.10.  As noted above, FMAP is a higher reimbursement rate than the federal matching provided for amounts spent "for the proper and efficient administration of the State plan," otherwise called, Federal Financial Participation (FFP).  42 U.S.C. § 1396b(a)(7); see also 42 C.F.R. § 433.15. Prior to 2009, all expenditures associated with the IHSS program, including expenditures for administering public authorities, were subject to federal reimbursements at the rate of the state's FMAP. Thus, Plaintiffs argue, because the federal government reimbursed public authorities as if they provided "care and services," payment to them should be subject to the requirements of Section 30(A).

Plaintiffs' argument has been called into question in light of the California Department of Health Care Services' (DHCS) interpretation of the recently passed American Recovery and Reinvestment Act of 2009 (ARRA).  Under the ARRA, section 5001, states may receive an enhanced share of federal funding at a higher level for expenditures for "medical assistance," compared to "administrative" costs.  On September 2, 2009, Plaintiffs' attorney wrote to the DHCS and asserted that public authority expenditures should be classified as "medical assistance," not "administrative." Gomez Decl, Exh. 1.  DHCS disagreed and concluded that all public

11

United States District Court
For the Northern District of California

authority costs "cannot be appropriately classified as 'medical assistance'" for purposes of the ARRA and, therefore, those costs are ineligible for funding at the higher reimbursement rate. Id., Exh. 3. The Department relied on the following three facts in rendering its conclusion: "(1) PA employees do not provide any direct services to beneficiaries whatsoever, even case management services; (2) the PA is not considered to be the actual employer of the individual IHSS providers for purposes outside of the collective bargaining setting; and (3) the PA does not directly pay the wages of the IHSS providers." Id. at 3. Therefore, DHCS found that all public authority expenses are "necessarily administrative in nature." Id.

Although the Court is not bound by the DHCS's interpretation of a federal statute, see Orthopaedic Hospital, 103 F.3d at 1495 ("We review de novo a state agency's interpretation of a federal statute."), its analysis of the ARRA's application to the funding of public authorities is instructive. Plaintiffs do not dispute the three facts underlying the DHCS's conclusion. Public authorities do not provide any direct services to IHSS recipients; they do not employ IHSS providers; and they do not directly pay the wages of IHSS providers. However, Plaintiffs argue that the administrative work of public authorities is so integral to the proper functioning of delivery of services to IHSS recipients that it should be considered "care and services," and subject to Section 30(A).

The Court concludes that, although most of the work performed by public authorities is purely administrative in nature,

Plaintiffs have submitted evidence that at least some of the work performed by public authorities provides for the care and services of IHSS recipients.  For instance, the public authorities in San Francisco, San Bernardino and Tulare Counties provide IHSS recipients with emergency replacement services from employed home care workers in the event that a recipient's regularly scheduled provider is unable to provide services on any given day.  Calame Supp. Decl. ¶¶ 3-5, Lopez Supp. Decl. ¶¶ 10-11, Tarvin Decl. ¶ 4. These emergency on-call services prevent unnecessary and more costly public expenses through 9-1-1 calls and emergency room visits.  Moreover, Plaintiffs have shown that public authorities train IHSS providers in various care-related skills, such as properly lifting an individual out of bed or bath, properly ambulating a bed-ridden individual and changing bandages.  Calame Supp. Decl. ¶ 8, Lopez Supp. Decl. ¶ 10, Tarvin Decl. ¶ 3.

Thus, although public authorities do not directly care for IHSS recipients in the same way that IHSS providers do, Plaintiffs have submitted evidence that public authorities provide integral services that directly impact the care IHSS recipients receive. Accordingly, Plaintiffs have shown at least some likelihood of success on the merits of their Medicaid claims.

2.   Americans with Disabilities Act and Rehabilitation Act Claims

The Americans with Disabilities Act (ADA) and the Rehabilitation Act prohibit discrimination based on disability.  42 U.S.C. § 12132; 29 U.S.C. § 794(a).  Unnecessary isolation is a form of discrimination against people with disabilities.  As the

13

United States District Court
For the Northern District of California

Supreme Court has explained, "[u]njustified isolation of the disabled" amounts to discrimination because institutional placement "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597, 60-61 (1999).

Thus, both the ADA and the Rehabilitation Act contain an "integration mandate" which "serves one of the principal purposes of Title II of the ADA: ending the isolation and segregation of disabled persons." Arc of Washington State v. Braddock, 427 F.3d 615, 618 (9th Cir. 2005). States are required to provide care in integrated environments for as many disabled persons as is reasonably feasible, so long as such an environment is appropriate to their health needs. Specifically, the ADA regulations provide: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified persons with disabilities." 28 C.F.R. § 35.130(d).

"The 'most integrated setting' is defined as 'a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible.'" Brantley, 2009 WL 2941519, at *6 (citing 28 C.F.R. pt. 35 app. A; Olmstead, 527 U.S. at 592).

Plaintiffs allege that AB X4 1 violates the "integration mandate" of the ADA and the Rehabilitation Act by placing people in serious risk of being forced to move out of their homes to the less

14

**United States District Court**
For the Northern District of California

integrated setting of institutions.   Although <u>Olmstead</u> addressed ongoing institutionalization, persons who currently reside in community settings may assert ADA integration claims to challenge state actions that give rise to a risk of unnecessary institutionalization.   <u>See Fisher v. Oklahoma Health Care Auth.</u>, 335 F.3d 1175, 1181-82 (10th Cir. 2003) (imposition of cap on prescription medications placed participants in community-based program at high risk for premature entry into nursing homes in violation of ADA); <u>Ball v. Rogers</u>, 2009 WL 1395423, at *5 (D. Ariz.) (failure to provide them with needed services "threatened Plaintiffs with institutionalization, prevented them from leaving institutions, and in some instances forced them into institutions in order to receive their necessary care" in violation of the ADA and Rehabilitation Act); <u>Mental Disability Law Clinic v. Hogan</u>, 2008 WL 4104460, at *15 (E.D.N.Y.) ("even the risk of unjustified segregation may be sufficient under <u>Olmstead</u>").

AB X4 1 was implemented on October 1, 2009, more than six months ago, and the individual Plaintiffs have not asserted that, in that time, they have been threatened with institutionalization because of decreased funding for public authorities.   Neither have Plaintiffs identified any particular future threat of institutionalization.   Although funding cuts to public authorities may affect IHSS recipients' ability to find qualified providers, Plaintiffs have not supported this assertion with persuasive evidence.   At most, Plaintiffs have presented declarations from IHSS recipients who describe their fears of institutionalization if public authorities were no longer able to provide <u>any</u> assistance.

United States District Court
For the Northern District of California

However, Plaintiffs' evidence does not suggest that the present budget cuts have threatened the very existence of public authorities.  Accordingly, Plaintiffs have not shown a likelihood of success on their ADA and Rehabilitation Act claims.

> B.   Irreparable Harm, Balance of Hardships and the Public Interest

Plaintiffs must show that they are likely "to suffer irreparable harm in the absence of preliminary relief." Winter, 129 S. Ct. 374.  Because injunctive relief is an "extraordinary remedy," the Court will not issue a preliminary injunction "based only on a possibility of irreparable harm." Id. at 375-76.  Here, Plaintiffs' evidence does not establish that they are likely to suffer irreparable harm absent an injunction while this action proceeds to a judgment on the merits.

As noted above, AB X4 1 was signed into law on July 28, 2009 and the State issued its allocations of funding to public authorities under the new law on October 1, 2009; however, Plaintiffs did not seek a preliminary injunction until February 24, 2010.  "Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc., 762 F.2d 1374, 1377 (9th Cir. 1985).  By now, Plaintiffs have lived with reduced funding for public authorities for over one-half of a year, but have not produced evidence of any specific injuries they have suffered as a result of AB X4 1.

The balance of hardships and the public interest does not clearly weigh in either side's favor.  If the preliminary

16

United States District Court
For the Northern District of California

injunction issues, the State Defendants' sole injury will be the financial costs associated with continuing to provide services under the status quo.  The Court weighs California's budget crisis in the balance.  However, "[a] budget crisis does not excuse ongoing violations of federal law, particularly when there are no adequate remedies available other than an injunction."  Independent Living Ctr., 572 F.3d at 659.  Although budget cuts to the public authorities makes administering IHSS more difficult, Plaintiffs have not demonstrated that AB X4 1 has harmed IHSS recipients in any significant and immediate manner.  Therefore, the public does not have a strong interest in enjoining the law.

In sum, Plaintiffs have not demonstrated a strong likelihood of success on the merits of their Section 30(A), ADA and Rehabilitation Act claims.  Moreover, Plaintiffs have not shown that, absent a preliminary injunction, they are likely to suffer irreparable harm.  Further, neither the balance of hardships nor the public interest demand an issuance of an injunction.  Accordingly, the Court denies Plaintiffs' motion for a preliminary injunction.

II.  Motion to Dismiss for Failing to State a Claim

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In

17

considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. <u>NL Indus., Inc. v. Kaplan</u>, 792 F.2d 896, 898 (9th Cir. 1986). However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. <u>Ashcroft v. Iqbal</u>, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009) (citing <u>Twombly</u>, 550 U.S. at 555).

Defendants move to dismiss Plaintiffs' first, second and fifth causes of action. Plaintiffs' first and second causes of action concern claims under the procedural and substantive requirements of Section 30(A) of the Medicaid Act. Although the Court denied Plaintiffs' motion for a preliminary injunction based on these claims, the Court notes that, as plead, they state proper claims for relief. Accordingly, the Court will allow the first and second causes of action to proceed beyond the pleadings stage and into discovery.

Plaintiffs' fifth cause of action asserts that Governor Schwarzenegger exceeded the line-item veto authority granted to him under Article IV, Section 10(e) of the California Constitution. Plaintiffs seek an injunction against implementation of the Governor's reductions to public authority funding for fiscal year 2009-2010 and a declaratory judgment that his line-item veto reducing public authority funding violates the California Constitution and is thus null and void.

The Eleventh Amendment bars claims in federal court that

18

United States District Court
For the Northern District of California

allege that state officials acting in their official capacities violated state law.  Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 117 (1984) ("A federal suit against a state official on the basis of state law contravenes the Eleventh Amendment when -- as here -- the relief sought and ordered has an impact directly on the State itself.").  Plaintiffs claim that the Eleventh Amendment does not bar this claim because the Governor was acting "ultra vires" when he exercised his line-item veto power to further reduce funding for public authorities.  However, it is irrelevent whether the Governor acted "ultra vires."  Because Plaintiffs seek to sue the Governor based on an alleged violation of state law, any relief a federal court could provide would not "vindicate the supreme authority of federal law."  Id. at 105 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.  Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").  Therefore, no exception to the application of the Eleventh Amendment applies.  Accordingly, the Court grants Defendants' motion to dismiss Plaintiffs' fifth cause of action.

III.  Standing

     Article III limits the jurisdiction of the federal courts to "cases" and "controversies."  In order to satisfy the "case or controversy" requirement, a plaintiff must show that: "(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely

to be redressed by a favorable court decision." <u>Salmon Spawning &</u>
<u>Recovery Alliance v. Gutierrez</u>, 545 F.3d 1220, 1225 (9th Cir.
2008).  "Article III standing requires an injury that is actual or
imminent, not conjectural or hypothetical." <u>Cole v. Oroville Union</u>
<u>High Sch. Dist.</u>, 228 F.3d 1092, 1100 (9th Cir. 2000) (internal
quotation marks omitted).

An entity has associational standing where "(a) its members
would otherwise have standing to sue in their own right; (b) the
interests it seeks to protect are germane to the organization's
purpose; and (c) neither the claim asserted nor the relief
requested requires the participation of individual members in the
lawsuit." <u>Hunt v. Wash. State Apple Adver. Comm'n</u>, 432 U.S. 333,
343 (1977).

Defendants argue that Plaintiff California Association of
Public Authorities does not have standing because it cannot meet
the first element of <u>Hunt</u>.  Defendants assert that, because public
authorities are "political subdivisions of a state," they "may not
challenge the validity of a state statute in a federal court on
federal constitutional grounds." <u>Palomar Pomerado Health System v.</u>
<u>Belshe</u>, 180 F.3d 1104, 1107 (9th Cir. 1999) (internal quotation
marks and citation omitted).  In <u>Palomar</u>, the Ninth Circuit
concluded that Palomar Pomerado Health System, a health care
district, was a political subdivision of California because it was
a "public corporation formed under California law," and the State
granted it "limited governmental functions within a particular
area of the state." <u>Id.</u> at 1107.  For example, Palomar Pomerado
possessed the power to levy taxes, issue bonds and the power of

**United States District Court**
For the Northern District of California

1  eminent domain.  <u>Id.</u>

2      Similar to the hospital district in <u>Palomar</u>, a public

3  authority is authorized pursuant to state law as a "corporate

4  public body, exercising public and essential governmental

5  functions" within a particular county.  Cal. Welf. & Inst. Code

6  § 12301.6(b)(2)(B).  However, public authorities do not exercise

7  any governmental functions similar in scale to those excercised by

8  the hospital district in <u>Palomar</u>.  Public authorities do not levy

9  taxes, issue bonds or have the power of eminent domain.  Rather,

10  public authorities are established for the sole and limited purpose

11  of "provid[ing] for the delivery of in-home supportive services."

12  <u>Id.</u> § 12301.6(a)(2).  Their delineated powers consist of the powers

13  to contract for services and to pay for such services.  These

14  powers are much more limited than those of the health care district

15  in <u>Palomar</u>.  Therefore, public authorities are not political

16  subdivisions for purposes of standing.  Accordingly, Defendants'

17  challenge to Plaintiffs' standing fails.

18                          CONCLUSION

19      For the foregoing reasons, the Court denies Plaintiffs' motion

20  for a preliminary injunction (Docket No. 10) and grants in part

21  Defendants' motion to dismiss (Docket No. 11).  Plaintiffs fifth

22  cause of action for violation of the California Constitution is

23  dismissed with prejudice because amendment would be futile.

24      IT IS SO ORDERED.

25  Dated: 05/05/10

26                          _____
                            CLAUDIA WILKEN

27                          United States District Judge

28
                            21